UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MONTE MILLS,<br><br>     Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD<br>COMPANY,<br><br>     Defendant. | Case No. 1:22-cv-00143-DCN<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

## I. INTRODUCTION

Before the Court are Plaintiff Monte Mills' Motion in Limine to Exclude Expert Testimony (Dkt. 26), Defendant Union Pacific's Motion for Summary Judgment (Dkt. 29), Union Pacific's Motion to Strike Opinions from Mills' Experts (Dkt. 40), and Union Pacific's Objection to Mills' Notice of Supplemental Authority (Dkt. 48). The Court held oral argument on the three motions on December 7, 2023, and took the matters under advisement. Regarding Union Pacific's Objection to Mills' Notice of Supplemental Authority, the Court finds that the facts and legal arguments are adequately presented, and that the decisional process would not be significantly aided by oral argument. Accordingly, the Court will rule on the Objection without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). Upon review, and for the reasons set forth below, the Court DENIES Mills' Motion in Limine, DENIES Union Pacific's Motion for Summary Judgment, DENIES

Union Pacific's Motion to Strike, and SUSTAINS Union Pacific's Objection to Mills' Notice of Supplemental Authority.

## II. BACKGROUND

### A. Factual Background

Federal regulations require locomotive conductors to meet certain standards of visual acuity—including standards of color vision—before they are allowed to conduct trains. *See* 49 C.F.R. § 240.121(c). To comply with these regulations, railroad companies test their conductors approximately every three years to verify that they meet the required vision standards. The federal regulations set forth a variety of acceptable testing methods to verify a conductor's ability to distinguish between the colors of railroad signals. *See* 49 C.F.R. App. F(4). If a conductor fails the test chosen by his or her employer, the conductor may request further testing—often a field test—to determine fitness for duty.

Union Pacific's color vision test process begins with the administration of an Ishihara fourteen-plate color vision test—a test that is very sensitive to color-vision deficiency. If a conductor passes the test, he or she is recertified to conduct trains without issue. If a conductor fails, the conductor generally proceeds to a field test to determine if, despite any color vision deficiency, he or she can still safely operate trains. If a conductor passes the field test, he or she is likewise recertified by Union Pacific.

Monte Mills worked as a conductor for Union Pacific for over twelve years. During that span, Union Pacific tested Mills' vision at least three times. In each of the first two tests, Mills failed the Ishihara, due to a color-vision deficiency. However, in each instance, Mills subsequently passed Union Pacific's field test, and was recertified.

In 2016, Union Pacific again tested Mills' color vision. Again, Mills failed the Ishihara and proceeded to a field test. However, by 2016, Union Pacific had adopted a new field test of its own creation called the Light Cannon. Mills failed the Light Cannon test, and as a result, Union Pacific denied him recertification. This denial effectively ended Mills' employment as a conductor at Union Pacific, despite his incident-free work history.

### B. Procedural Background

On March 21, 2022, Mills filed suit against Union Pacific, alleging unlawful discrimination on the basis of disability, as prohibited by § 12112 of the Americans with Disabilities Act (the "ADA"). Dkt. 1. The litigation proceeded with discovery and the disclosure of proposed expert witnesses. Subsequently, Mills filed a Motion in Limine, requesting that the Court exclude testimony from Union Pacific's expert witness. Dkt. 26. Union Pacific, for its part, moved for summary judgment (Dkt. 29) and filed a Motion to Strike Testimony from Mills' Experts (Dkt. 40). Additionally, on October 10, 2023, Mills filed a Notice of Supplemental Authority (Dkt. 46) to which Union Pacific promptly objected, requesting that the Notice be stricken from the record (Dkt. 48).

### III. LEGAL STANDARDS

The motions and objection before the Court implicate a variety of legal standards. The Court will outline the major standards here, then proceed with its analysis below.

### A. Motions in Limine

"Motions in limine are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues." *Miller v. Lemhi Cty.*, 2018 WL

1144970, at *1 (D. Idaho Mar. 2, 2018) (citing *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002)). "The term 'in limine' means 'at the outset.' A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (quoting Black's Law Dictionary 803 (8th ed. 2004)).

Because "[a]n in limine order precluding the admission of evidence or testimony is an evidentiary ruling," a district court has discretion in ruling on motions in limine. *United States v. Komisaruk*, 885 F.2d 490, 492 (9th Cir. 1989) (cleaned up); *see also United States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991). Further, in limine rulings are preliminary and, therefore, "are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

## B. Expert Testimony

The extent to which experts may render an opinion is addressed under the well-known standard established in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny, now set forth in Rule 702 of the Federal Rules of Evidence. *See Moore v. Deer Valley Trucking, Inc.*, 2014 WL 4956241, at *1 (D. Idaho Oct. 2, 2014). Rule 702 establishes several requirements for admitting an expert opinion. First, the evidence offered by the expert must assist the trier of fact either to understand the evidence or to determine a fact in issue. *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010); Fed. R. Evid. 702. "The requirement that the opinion testimony assist the trier of fact goes primarily to relevance." *Id.* at 564 (cleaned up).

Additionally, the witness must be sufficiently qualified to render the opinion. *Id.* If

specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a witness qualified by knowledge, skill, experience, training, or education may offer expert testimony where: (1) the opinion is based upon sufficient facts or data, (2) the opinion is the product of reliable principles and methods; and (3) the witness has applied those principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592–93; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). This inquiry is a flexible one. *Primiano*, 598 F.3d at 564. Ultimately, a trial court must "assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* (cleaned up).

Reliability and relevance, however, must be distinguished from problems with expert opinions that amount to impeachment and, consequently, do not warrant exclusion. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (stating that, under *Daubert*, "[t]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable") (cleaned up).

Finally, Federal Rules of Evidence 602 and 703 make clear that expert testimony need not be based on personal knowledge. Further, expert testimony may be based on evidence that is otherwise inadmissible, like hearsay. Fed. R. Evid. 703. The key questions in evaluating expert testimony are "not whether [an expert's] opinions are based on events he personally observed, but whether experts in the particular field would reasonably rely on [the same kinds of facts the expert relied on] . . . in forming an opinion on the subject," and whether the expert is "applying his training and experience to the sources before him and reaching an independent judgment." *Swope v. Oneida School District No. 351*, 2019

WL 1781405, *4 (D. Idaho Apr. 23, 2019); *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013).

### C. Summary Judgment

Summary judgment is appropriate when the moving party can show that, as to any claim or defense—or part of any claim or defense—"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. Of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted).

Further, "the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Santillan v. USA Waste of California, Inc.*, 853 F.3d 1035, 1042 (9th Cir. 2017) (cleaned up). This is "because the ultimate question [of discrimination] is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the

MEMORANDUM DECISION AND ORDER - 6

factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (cleaned up).

### D. Disparate Treatment and Disparate Impact Under the ADA

"Both disparate-treatment and disparate-impact claims are cognizable under the ADA." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003); *Lopez v. Pacific Maritime Ass'n*, 657 F.3d 762, 767 (9th Cir. 2011). To prove disparate treatment, an employee must show he or she: (1) is disabled, (2) is a qualified individual, and (3) suffered an adverse employment action due to his or her disability. *See, e.g.*, *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). To establish a prima facie case of disparate impact, a plaintiff must show that a facially neutral employment practice had a significant discriminatory impact on an individual in an ADA-protected group. *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1224 (9th Cir. 2021). "Once an employee shows that a qualification standard tends to screen out an individual with a disability, the employer shoulders the burden of proving that the challenged standard is job-related and consistent with business necessity." *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 862 (9th Cir. 2009); *see also Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 992–93 (9th Cir. 2007).

### E. Notices of Supplemental Authority

"The purpose of a Notice of Supplemental Authority is to inform the court of a newly decided case that is relevant to the dispute before it . . . ." *Miesen v. Hawley Troxell Ennis & Hawley*, 2022 WL 1422942, at *11 (D. Idaho May 5, 2022) (cleaned up). Where a notice of supplemental authority fails to do so, the notice may be stricken from the record. *See id.*

## IV. DISCUSSION

The Court will address the three Motions and the Objection in the order in which they were filed, beginning with Mills' Motion in Limine (Dkt. 26), followed in turn by Union Pacific's Motion for Summary Judgment (Dkt. 29), Union Pacific's Motion to Strike (Dkt. 40), and Union Pacific's Objection (Dkt. 48).

### A. Mills' Motion in Limine

Mills moves the Court to exclude the testimony of Union Pacific's expert, Steven Fender. Dkt. 26. Fender is a Railroad Transportation and Safety Consultant. Dkt. 28-2, at 2. He has worked for the Federal Railroad Administration (the "FRA") in several positions over the course of many years. *Id.* The parties agree that Fender's proposed testimony centers on whether the Light Cannon test complies with 49 C.F.R. § 240. Dkt. 26, at 5; Dkt. 28-2, at 5; Dkt 34, at 4–5.

Mills contends that the Fender's testimony is neither relevant, nor is it based upon a reliable foundation, and it should, therefore, be precluded. Dkt. 27. Union Pacific counters that Fender's testimony is not only reliable and relevant, but that it is dispositive because employers cannot face liability for adhering to federally imposed safety guidelines. Dkt. 34, at 4. Upon consideration, the Court finds that, while not dispositive, Fender's testimony is both reliable and relevant, particularly should Union Pacific need to establish an affirmative defense to Mills' ADA claim. Accordingly, Fender's testimony will be allowed. The Court elaborates on the legal standards and explains its reasoning below.

#### 1. Federal Regulations

The federal regulations at issue here aim to ensure that conductors of trains can

"recognize and distinguish between the colors of railroad signals . . . ." 49 C.F.R. § 240.121(c)(3). In pursuit of this goal, the regulations include a list of acceptable color-vision tests in Appendix F of 49 C.F.R. § 240. However, the FRA itself has acknowledged that some individuals who cannot pass the tests from Appendix F may nevertheless be qualified to conduct trains. 80 Fed. Reg. 73123 ("FRA's longstanding view is that there are some people who, despite not meeting the [color vision standards], have sufficient residual visual capacity to safely perform as a locomotive engineer or conductor."). Significantly, the federal regulations *do not* prescribe a follow-up test for railroad companies to administer to those who fail the Appendix F tests. Rather, the regulations establish a framework for railroad companies to employ in further evaluating whether their conductors can safely operate trains. *See, e.g.*, *Id.* at 73124. Within this framework, railroad companies have significant discretion in selecting and implementing follow-up testing procedures. *Id.*

### 2. Affirmative Defenses

Once an employee has established a prima facie case under the ADA, an employer may nevertheless avoid liability for an allegedly discriminatory qualification standard by asserting an affirmative defense like business necessity or direct threat. *See* 42 U.S.C. § 12112(b)(6); 42 U.S.C. § 12113(b). To successfully assert a defense of business necessity, an employer must show that the challenged standard is both job-related and consistent with business necessity, and that performance cannot be accomplished by reasonable accommodation. *Bates*, 511 F.3d at 995.

### 3. The Reliability of Fender's Testimony

The FRA has made clear that a field test offered by a railroad company must be "valid,

reliable, and comparable . . . for assessing whether a person who fails an initial vision test can safely perform as a locomotive engineer or conductor." 80 Fed. Reg. 73122, at 73124. At oral argument, Mills contended that determining whether the Light Cannon is valid, reliable, and comparable requires a medical, scientific inquiry. He argues that, because Fender does not have a medical background, he has no basis from which to claim that the Light Cannon meets those criteria.

Testimony based on a medical or scientific assessment of the Light Cannon very well may be more persuasive than Fender's. Nevertheless, the Court does not find, as Mills contends, that Fender's expertise is wholly inappropriate for evaluating the Light Cannon as a field test. Fender has an extensive and distinguished professional history in the field of railroad safety. *See* Dkt. 28-2, at 2–4. From this history, it appears that Fender would know better than most, whether a particular field test reasonably mimics the conditions faced by train operators, and whether use of the Light Cannon is at least permissible under federal regulations. The Court acknowledges that Fender has no medical or scientific background. Mills is free to highlight these perceived limitations through cross examination. However, the limitations are not so severe as to merit Fender's disqualification.

### 4. Relevance of Fender's Testimony

Of central importance to this case is whether Union Pacific's refusal to recertify Mills constitutes disability discrimination under the ADA. However, of possibly equal importance is whether Union Pacific can establish an affirmative defense to disability discrimination. As mentioned above, one possible affirmative defense requires the fact finder to determine whether Union Pacific can show a business necessity. Fender's testimony regarding the Light

Cannon's compliance with the "spirit and intent" federal regulations could certainly inform a fact finder's opinion on that question, if not on others. *See* Dkt. 2802, at 5. Mills raises concerns that, even if relevant, Fender's testimony is likely to confuse the jury. Dkt. 27, at 11. While Fender's testimony may present some remote possibility of confusion, the Court is confident that such confusion can be remedied through cross examination. Accordingly, the testimony is admissible.

### 5. Fender's Testimony is Not Dispositive

Union Pacific contends that Fender's testimony is not only relevant and reliable, but that it is dispositive under *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 573–74 (1999). While the Court acknowledges the relevance and reliability of Fender's testimony, it finds that Union Pacific's position stretches the holding from *Albertson's* a bridge too far.

In *Albertson's*, the Department of Transportation (the "DOT") had promulgated a regulation requiring drivers of commercial vehicles in interstate commerce to have a visual acuity of at least 20/40 in each eye. *Id.* at 558–59. Drivers who fell short of that standard could still be certified by the DOT if they qualified for a waiver. *Id.* at 560. To be granted a waiver, applicants had to show a clean driving record and submit to regular vision examinations. *Id.*

In 1992, Albertson's fired a truck driver because his vision was determined to fall below the federal standard. *Id.* Shortly thereafter, the truck driver obtained a waiver from the DOT, but Albertson's refused to rehire him. *Id.* The truck driver subsequently sued, alleging his termination constituted an ADA violation. *Id.* at 560–61. The Supreme Court found that it did not because Albertson's had the right to insist and rely upon a specific, substantive

federal safety regulation. *Id.* at 577–78. Regarding the truck driver's waiver, the Supreme Court determined that the waiver program was "simply an experiment with safety," conducted by the DOT to inform future updates to federal regulations. *Id.* at 576. Elaborating, the Supreme Court held that "[n]othing in the waiver regulation . . . required an employer of commercial drivers to . . . participate in the Government's experiment." *Id.* at 577. Accordingly, Albertson's was entitled to insist upon the federal standard and was justified in firing and refusing to rehire its former truck driver.

This holding is in harmony with 29 C.F.R. section 1630.15(e), which states "[i]t may be a defense to a charge of discrimination [under the ADA] that a challenged action is required or necessitated by another Federal law or regulation, or that Federal law or regulation prohibits an action . . . that would otherwise be required by this part."

At oral argument, Union Pacific contended that, like Albertson's, it is entitled to exercise its discretion in a manner consistent with federal regulations, even if that exercise discriminates against individuals like Mills. However, as Mills correctly asserts, the facts here differ significantly from those in *Albertson's*. In *Albertson's*, the regulations imposed a strict, 20/40 acuity standard. *Albertson's*, 527 U.S. at 558–59. If a truck driver's vision fell below that standard, the driver was prohibited from driving *unless* his or her employer chose to participate in a voluntary DOT "experiment with safety." *Id.* at 576. Here, the closest thing we have to the 20/40 acuity standard is the Ishihara test. However, whereas in *Albertson's*, employers were free to opt in or out of the DOT's experiment, here Union Pacific is not free to opt out of conducting follow up tests. The governing regulations are clear that individuals who fail the Ishihara "*shall*, upon request, be subject to further

medical evaluation . . . ." 49 C.F.R. § 240.121(e) (emphasis added).[1]

The Court acknowledges that the regulations give railroad companies discretion in choosing *how* to employ a follow-up test. However, this discretion is not carte blanche. It must be exercised within the bounds of other federal laws, including the ADA. This means that testimony regarding the Light Cannon's compliance with the federal regulations, while potentially relevant, is not dispositive in resolving this case.

In sum, Fender's work experience is a sufficient basis from which to testify regarding Union Pacific's use of the Light Cannon as a field test. Further, because Fender's testimony could relate, at very least, to an affirmative defense for Union Pacific, the Court finds his testimony to be relevant. Accordingly, Mills' Motion to Exclude Fender's Testimony (Dkt. 26) is DENIED. However, because federal regulations do not require use of the Light Cannon, the Court clarifies that his testimony is not dispositive.

## B. Union Pacific's Motion for Summary Judgment

Union Pacific moves for summary judgement, contending (1) Mills' claims are time barred, (2) Mills is not a "qualified individual" under the ADA and relevant caselaw, (3) Union Pacific had "legitimate, non-discriminatory, and non-pretextual" reasons for not allowing Mills to return to the conductor position, and (4) Mills cannot establish a disparate impact claim. Dkt. 29-1, at 1–2. The Court will address the shortcomings of each of these grounds below.

---

[1] "Appropriate further medical evaluation could include providing another approved scientific screening test or a field test." 49 C.F.R. App. F(4). Both parties acknowledge that the Light Cannon is a field test.

*1. Mills' Claims Are Not Time-Barred*

42 U.S.C. § 2000e–5 sets forth the proper procedure for asserting a claim under the ADA. Per subsection (f)(1), an aggrieved party must first file a charge with the Equal Employment Opportunity Commission (the "EEOC"). 42 U.S.C. § 2000e–5(f)(1). The EEOC may then obtain a conciliation agreement from the employer, initiate a civil action against the employer if such an agreement is not obtained, or dismiss the charge. *Id.* If the EEOC dismisses the charge, or if it has not initiated a civil action within 180 days, the EEOC must notify the aggrieved party that he or she has an individual right to sue the employer. *Id.* The EEOC typically gives such notice by sending a notice-of-right-to-sue letter. After receipt of a notice letter, the aggrieved party has ninety (90) days to initiate his or her own civil action. *Id.* Because failure to initiate an action within that time window results in the aggrieved party's claims being barred, the ninety-day period is the functional equivalent of a limitations period. *See Stiefel v. Bechtel Corp.*, 624 F.3d 1240, 1243–45 (9th Cir. 2010); *Scholar v. Pac. Bell*, 963 F.3d 264, 266–67 (9th Cir. 1992).

In the Ninth Circuit, courts presume a notice letter arrived three days after it was issued where there is no dispute that the letter was received. *Payan v. Aramark Mgmt. Servs. Ltd. Partnership*, 495 F.3d 1119, 1123–25 (9th Cir. 2007). However, where a party disputes receipt of a notice letter, the mailbox rule, and *not* the *Payan* presumption, applies. *Id.* at 1123 n. 4; *Rubalcaba v. Gucci Am., Inc.*, 2012 WL 5205596, *2 (D. Ariz. Oct. 22, 2012). The mailbox rule dictates that "if a letter properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed . . . that it reached its destination at the regular time and was received by the person to whom it was

addressed." *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884).

In applying the mailbox rule, the court presumes receipt of a letter only if the party asserting receipt provides evidence of mailing. Evidence of mailing may consist of a proof of certified mail, a sworn declaration of mailing, or evidence of automated mailing systems. *See Nelmida v. Shelly Eurocars, Inc.*, 1123 F.3d 380, 384 (9th Cir. 1997) (certified mail); *Scholar*, 963 F.2d at 267 (certified mail); *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 964 (9th Cir. 2001) (sworn statement); *Mahon v. Credit Bureau of Placer Cnty., Inc.*, 171 F.3d 1197, 1201–02 (9th Cir. 1999) (automated mailing systems). If a party introduces evidence of mailing, the evidence creates a rebuttable presumption that the document was received. *Schikore*, 269 F.3d at 963. The opposing party then bears the burden of rebutting the presumption. *Id.*

Here, the parties do not dispute that Mills properly filed a charge with the EEOC. However, what happened thereafter is contested. Union Pacific asserts that Mills received a notice of his right to sue in January 2021. In support of its position, Union Pacific points to Mills' deposition testimony. Dkt. 29-1, at 3. During Mills' deposition, Union Pacific asked, "[n]otice of right to sue, any reason to believe you didn't receive this on or around July—or January 21st of 2021?" to which Mills replied, "[n]o." *Id.*; *see also* Dkt. 29-6, at 9–10, 19. In addition to Mills' deposition, Union Pacific proffers the notice letter it claims the EEOC sent to Mills, which says it was mailed January 21, 2021. Dkt. 29-10, at 1. Because Mills filed his suit on March 31, 2022—far beyond ninety days from January 21, 2021—Union Pacific contends that the present action is time-barred.

Contrarily, Mills claims he never received the notice. Dkt. 35, at 5. Further, he

argues that during his deposition, he was not entirely sure what a notice of right to sue was. *Id.* at n.1. He knew he had received a variety of documents from the EEOC, so he assumed the notice letter was one of them. *Id.* However, upon closer investigation by both Mills and his counsel, including a search through the EEOC's file on Mills, neither found the letter itself, nor any evidence that the letter was ever mailed to Mills. *Id.* Both Mills and his counsel have provided the Court with sworn declarations, attesting to this story. Dkt. 35-3; Dkt. 35-7.

Because Mills has denied receipt of the letter, this dispute is governed by the mailbox rule, and not the *Payan* presumption. The question then becomes whether Union Pacific has met its burden of proving that Mills received the letter.

At oral argument, Union Pacific asserted that, under *Schikore*, Mills cannot contradict his deposition testimony by simply claiming he does not have the notice letter in his files. Instead, to effectively dispute his deposition testimony, he would need to make a strict denial by claiming "I did not receive this," or something similarly definitive. The Court finds this assertion to be a misapplication of *Schikore* to the facts at hand.

In *Schikore*, the defendant's receipt of a key document was disputed, just as Mills disputes that he received a notice letter from the EEOC. 269 F.3d at 963. However, there, the party trying to prove receipt (the plaintiff) had introduced a sworn declaration that the document in question had been mailed—creating a rebuttable presumption of receipt. *Id.* at 964. The only evidence the opposing party presented to rebut the presumption was a claim that the document in question could not be found in company records. *Id.* at 964. The Ninth Circuit found that this assertion, alone, was insufficient to overcome the presumption

of receipt created by the sworn statement of mailing. *Id.*

Here, Union Pacific has not proffered any evidence that the notice letter was mailed to Mills, as required by the mailbox rule. *See Rosenthal*, 11 U.S. at 193. Thus, unlike the defendant's denial in *Schikore*, Mills' denial of receipt need not overcome any presumption. Rather, the Court can give it the weight the Court deems appropriate. To be fair, the notice letter itself says it was mailed on January 21, 2021. Dkt. 29-10, at 1. However, Ninth Circuit district courts have regularly held that the date on a notice letter itself is insufficient to satisfy the mailbox rule. *See Jensen v. Simon & Schuster, Inc.*, 2012 WL 6839713 at *3–4 (D. Or. Dec. 12, 2012) (denying motion to dismiss where the only evidence of a notice letter being mailed was the date and address on the letter itself); *Rubalcaba*, 2012 WL 5205596 at *2 (same); *Turner v. Dep't of Educ.*, 2011 WL 1637333 at *6 (D. Haw. Apr. 28, 2011) (same).

Union Pacific also cites to *Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) in its opposition to Mills' denial of receipt. Dkt. 38, at 3. There, the Ninth Circuit stated that, as a general rule, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Id.* at 1080. This rule is known as the sham affidavit rule. It allows a court to "prevent[] a party who has been examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradicting [his or her] own prior testimony." *Id.* (cleaned up). Such a rule is important to preserving "the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (cleaned up).

Nevertheless, the Ninth Circuit has made clear that "the sham affidavit rule 'should be applied with caution.'" *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir.

MEMORANDUM DECISION AND ORDER - 17

2009) (quoting *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993)). This is because "it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Yeager*, 693 F.3d at 1080 (cleaned up). Accordingly, before finding that the sham affidavit rule applies, "the district court must make a factual determination that the contradiction is a sham." *Id.* Such a determination is appropriate where a declarant suddenly claims to remember information that he or she had previously testified to have forgotten, where a declarant "refuses to give information which in the nature of things [he or she] should know," or where a declarant's explanation of his or her inconsistent testimony is weak or implausible. *Id.* at 1080–81 (cleaned up). The Ninth Circuit has instructed district courts further that "minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* at 1081 (cleaned up).

Here, there is insufficient evidence from which the Court could conclude that Mills' affidavit is a sham. His explanation of his contradictory statement is neither weak nor implausible. On the contrary, it is entirely reasonable for a lay person to be unfamiliar with the formalistic procedures and documents of the EEOC, and to assume that he had received all that he was supposed to have received. Mills is not claiming to now remember information he previously testified to have forgotten, and he never refused to give information that, in the nature of things, he should have known. Ultimately, Mills' inconsistent testimony appears much more likely to be the result of an honest discrepancy, a mistake, or newly discovered evidence than a sham. Accordingly, the Court finds the sham affidavit rule to be inapplicable here.

In sum, Mills has stated he did not receive the notice letter. While this statement is contrary to his deposition testimony, it is not precluded by application of the sham affidavit rule. Because Mills has denied receipt of the notice letter, the mailbox rule applies. Union Pacific has not introduced evidence that the notice letter was mailed to Mills. Therefore, he is not required to rebut any presumption of receipt. Considering the foregoing and viewing the facts in a light most favorable to Mills, the Court cannot say that Mills ever received his notice letter from the EEOC. This means the Court cannot find that Mills' claim is time-barred. Jurors may find otherwise, but the right to do so is reserved for them. Awarding summary judgment on the basis of untimely filing is inappropriate.

### 2. A Jury Could Reasonably Find that Mills is a Qualified Individual

Union Pacific next asserts that Mills' claims are foreclosed as a matter of law because he is not a "qualified individual" under the ADA. Dkt. 28-1, at 1. A qualified individual is one who: (1) has the requisite skill, experience, education, and other job-related requirements of the disputed position, and (2) can perform the essential functions of such position with or without a reasonable accommodation. *See, e.g.*, *Bates,* 511 F.3d at 990. "Essential functions are not to be confused with qualification standards, which an employer may establish for a certain position. Whereas essential functions are basic duties, qualification standards are personal and professional attributes that may include physical, medical, and safety requirements." *Id.*

Union Pacific begins this portion of its argument by responding to Mills' complaints that because the Light Cannon has not been scientifically vetted, it is not a valid field test. Union Pacific claims that federal regulations afford railroad companies discretion in

fashioning follow-up tests, and that not all such tests need to be scientifically validated. Dkt. 29-1, at 4–5. It then asserts that, because its administration of the Light Cannon has been approved by the FRA, any individual who fails the Light Cannon has not met the job-related requirements of the disputed position, and, therefore, is not qualified. Dkt. 29-1, at 3–6. It attempts to bolster this position by discussing two cases, *Albertson's* and *Bey v. City of New York*, wherein plaintiffs similar to Mills were found not to be qualified under the ADA. The Court addresses Union Pacific's arguments below.

a.  <u>The Light Cannon Need Not Be Scientifically Validated</u>

Mills has raised concerns about the scientific bona fides of the Light Cannon in various filings before the Court. *See, e.g.*, Dkt. 27, at 1; Dkt. 35, at 4. It is the Court's understanding that the Light Cannon was not intended to be a scientific screening test, but rather, a field test. *See* 49 C.F.R. App. F(4). Federal regulations are deliberate in distinguishing field tests from scientific screening tests. *Id.* ("Appropriate further medical evaluation could include providing another approved scientific screening test *or* a field test.") (emphasis added). While scientific screening tests are subject to various formal requirements, including peer review and clinical trial, field tests are not. *See Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors*, 80 Fed. Reg. 73122, at 73124. Instead, as mentioned previously, a suitable field test must simply be "valid, reliable, and comparable." *Id.* Thus, the Court agrees with Union Pacific's assertion that the Light Cannon is not bunk simply because it was not subjected to the same standards as a scientific screening test. However, that fact alone does not mean Union Pacific is out of the woods. As mentioned above, Union Pacific has discretion under the federal

regulations to develop and administer follow-up color-vision tests to those who fail the Ishihara. But that discretion must be exercised within the limits of the ADA.

### b. The FRA's Approval of the Light Cannon is Inapposite

Union Pacific brings to the Court's attention two previous instances in which FRA boards reviewed challenges to the Light Cannon. Dkt. 29-1, at 5–6. In the first instance, the reviewing board found that the Light Cannon is "an adequate field test as contemplated by [the federal regulations]." Dkt. 29-29, at 3. In the second, the reviewing board found simply that the conduct of Union Pacific in evaluating the color vision of a conductor was "in accordance with [federal regulations]." Dkt. 29-30, at 4.

Union Pacific relies on these decisions to assert that an employee who fails the Light Cannon "is unable to establish he is a 'qualified individual with a disability.'" Dkt. 29-1, at 6. This, Union Pacific argues, is because the Light Cannon constitutes either a prerequisite under the first step of the qualified individual analysis, or it is necessary to meet the essential functions of the job of conductor under the second step of the analysis. *Id.* at 6–7. Union Pacific, therefore, requests judgment as a matter of law. *Id.*

The Ninth Circuit addressed a similar situation in *Bates*. In relevant part, it stated "[the ADA] does not require that a person meet each of an employer's established 'qualification standards' to show that he is [a qualified individual under the ADA]." *Bates*, 511 F.3d at 990. The circuit court elaborated that "it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly *cannot* meet because of his disability and that forms the very basis of his discrimination challenge." *Id.* (emphasis in original). While this statement expressly applies to the second

prong of the qualified individual analysis, the logic holds true for the first prong as well. It would make no sense for the Court to hold that Mills has failed to meet the prerequisites for conducting trains simply because he failed the test he is currently challenging.

At the end of the day, whether Mills has the requisite skill, experience education, and other job-related requirements to be a conductor and whether he can perform the essential functions of a conductor with or without reasonable accommodation are questions of fact. The record indicates that Mills has a lengthy employment history of passing color-vision field tests and correctly identifying railroad signals. Dkts. 35-1–35-2. From these facts, a jury could reasonably find that Mills is a qualified individual. Accordingly, summary judgment on this basis is inappropriate.

### c. *Albertson's*

While the Court already addressed Union Pacific's reliance on *Albertson's* above, it will briefly expand upon its reasoning here. Union Pacific acknowledges that a central aspect of the Supreme Court's holding in *Albertson's* was the fact that Albertson's "was not insisting upon a job qualification merely of its own devising, subject to possible questions about genuine appropriateness and justifiable application to an individual for whom some accommodation may be reasonable." Dkt. 29-1, at 9; *Albertson's*, 527 U.S. at 570. Rather, Albertson's relied on a federally imposed benchmark in making its decision to fire its truckdriver, and the ADA did not require Albertson's to "reinvent the [g]overnment's own wheel." *Id.* at 577. Union Pacific goes on to say that because Mills could not meet the benchmarks published in 49 C.F.R. § 240.121, *Albertson's* forecloses his claim.

MEMORANDUM DECISION AND ORDER - 22

The problem with this line of reasoning is that the regulation in *Albertson's* provided a single, clear, substantive standard for the visual acuity of truck drivers in interstate commerce. *See* 49 C.F.R. § 391.41(b)(10) (1998). That regulation contained no field test provision, and certainly did not allow employers to choose how to evaluate the visual acuity of drivers. If a driver's vision fell below the standard, the driver simply could not drive unless he or she obtained a waiver and his or her employer chose to recognize the waiver.

The safety regulations here are not the same. *See* 49 C.F.R. § 240, App. F. Appendix F provides initial standards on which railroad companies can rely in detecting problematic color blindness—the Ishihara or other similar color-vision tests. *Id.* But, as previously discussed, an employee who falls short of those standards is not left without recourse. Subsection 4 of Appendix F affords railroad companies broad discretion in conducting further evaluation of the color vision of their employees. *Id.* at App. F(4) ("An examinee who fails to [pass the listed color-vision tests], may be further evaluated as determined by the railroad's medical examiner. Ophthalmologic referral, field testing, or other practical color testing may be utilized depending on the experience of the examinee.").

With the discretion afforded by Appendix F, Union Pacific created the Light Cannon, and used it to test Mills' color vision after he failed the Ishihara. In other words, *unlike* Albertson's, Union Pacific has insisted upon a job qualification of its own devising. And because reliance on the Light Cannon is not required by federal regulations, its use may be subject to questions about its appropriateness and justifiable application to Mills.

### d. *Bey v. City of New York*

Union Pacific next invokes *Bey v. City of New York* in support of its position, but

that case in inapplicable for much the same reason that *Albertson's* is. 999 F.3d 157 (2d

Cir. 2021). There, federal regulations prohibited firefighters from growing facial hair that

"come[s] between the sealing surface of the respirator's facepiece and the face." 29 C.F.R.

§ 1910.134(g)(1)(i)(A). A firefighter with Pseudofolliculitis Barbae sued, requesting a

reasonable accommodation. *Bey*, 999 F.3d, at 157. The Second Circuit ultimately found

that the fire department was not required to provide an accommodation. *Id.* at 170–71. In

doing so, the circuit court stated that employers are not required to defend adherence to

binding federal safety regulations against ADA challenges. *Id.* at 168.

Union Pacific claims that this case shelters it from ADA liability. It—somewhat

boldly—asserts that if Mills has an issue with the Light Cannon, he can take it up with the

FRA. Dkt. 29-1, at 11–12. However, as discussed above, it was not the FRA that created

the Light Cannon. It was Union Pacific. It was not the FRA that required Mills' color vision

to be tested by the Light Cannon. It was Union Pacific. Thus, Union Pacific's attempt to

analogize to *Bey* is unavailing.

*3. Mills Need Not Show Pretext, and* Mustafa *Provides an Insufficient Basis*

*for Summary Judgment*

a. A Showing of Pretext is Unnecessary

Next, Union Pacific asserts that Mills' claims are subject to the *McDonnell Douglas*

burden-shifting framework outlined by the Ninth Circuit in *Curley v. City of North Las*

*Vegas*, 722 F.3d 629, 632 (9th Cir. 2014). Under that framework, an employee alleging an

ADA violation is first required to show a prima facie case of discrimination. *Id.* If

successful, the employer then bears the burden of proving a "legitimate, nondiscriminatory,

or nonretaliatory reason for the adverse employment action." *Id.* (cleaned up). If it does so, then the claim fails unless the employee can prove that the employer's asserted reason for the action was pretextual. *Id.*

Invoking the *McDonnell Douglas* framework, Union Pacific argues that its "sole reason for denying Mills' certification was its obligation to comply with FRA safety regulations." Dkt. 29-1, at 12. Its use of the Light Cannon was not discriminatory, it contends, because all other engineers were subjected to the same testing protocols. *Id.* at 13. Union Pacific posits further that Mills is unable to establish pretext because none existed. *Id.* at 14. Rather, Mills' termination was a direct result of his failure to pass "FRA-mandated color vision screening tests." *Id.*

Mills disputes the relevance of the *McDonnell Douglas* framework, contending that it is applicable only where there is some dispute as to whether an adverse employment action was discriminatory. Dkt. 35, at 17. Where, as here, there is no dispute that an adverse employment action was the result of a disability, Mills argues that the burden shifting paradigm does not apply. *Id.* Mills also takes issue with Union Pacific's assertion that the Light Cannon is not discriminatory because it is administered even-handedly to all engineers. *Id.* at 16–17. He contends that even-handed administration does not cleanse a test of its discriminatory elements. *Id.*

On these issues, the Court agrees with Mills. In *Trans World Airlines, Inc. v. Thurston*, the Supreme Court held that the *McDonnell Douglas* framework is "inapplicable where the plaintiff presents direct evidence of discrimination." 469 U.S. 111, 121 (1985). The Ninth Circuit followed this holding in *McGinest v. GTE Serv. Corp.*, and elaborated

that, in response to a summary judgment motion, a plaintiff may employ the *McDonnell Douglas* framework, "*or alternatively*, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the defendant]." 360 F.3d 1103, 1122 (9th Cir. 2004) (emphasis added); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–100 (making clear that circumstantial and direct evidence should not be treated differently).

Here, neither side disputes that Mills' adverse employment outcome was the result of his failure to pass the Light Cannon test. Mills has presented evidence—call it direct or circumstantial—that the Light Cannon does not determine whether an individual who fails the Ishihara may nevertheless safely conduct trains, but rather, that it discriminates on the basis of disability. Whether such discrimination is justified in this instance is a separate question. Nevertheless, it is clear to the Court that Mills is not required to show pretext here to avoid summary judgment.

### b. *Mustafa* Relevance Standard

Arguing in the alternative, Union Pacific asserts that, where the burden-shifting framework does not apply, an employer accused of discrimination may nevertheless avoid liability so long as it can show that the employee's disability is relevant to the job's requirements. Dkt. 29-1, at 16; *Mustafa v. Clark County School Dist.*, 157 F.3d 1169, 1176 (9th Cir. 1998). Union Pacific then discusses the vital importance of color vision discernment to safe train operation. Dkt. 29-1, at 16.

The Court acknowledges that train conducting is a high-stakes occupation where at least some level of color-vision discernment is important. Nevertheless, whether Mills'

individual disability is relevant to the job requirements for a train conductor is a material question of fact that is disputed by Mills. Accordingly, summary judgment on this basis is inappropriate.

### 4. Mills' Disparate Impact Claim is Not Insufficient as a Matter of Law

Union Pacific asserts that Mills cannot establish a disparate impact claim because: (1) he has not introduced statistical evidence to support his claim, (2) he does not have an "actual disability," but rather, was only "regarded as" having a disability and (3) Union Pacific's use of the Light Cannon is justified by business necessity. Dkt. 29-1, at 16–17. The Court will address each of these contentions in turn.

### a. Statistical Evidence is Unnecessary

Union Pacific briefly argues that, because Mills has not introduced any statistical support in favor of a disparate impact claim, he cannot show that the Light Cannon has a disparate impact based upon disability. Dkt. 29-1, at 18 n.7. However, the Ninth Circuit recently clarified that, while "plaintiffs often support their claims of disparate impact with statistics . . . statistics are not strictly necessary. This is particularly true where a disparate impact is obvious." *Bolden-Hardge v. Off. of California State Controller*, 63 F.4th 1215, 1227 (9th Cir. 2023).

Here, it is obvious that the purpose of the Light Cannon is to screen out individuals with color vision deficiency. Requiring Mills to present statistical evidence that the Light Cannon does what it is expressly designed to do would be unnecessary and wasteful. Therefore, Mills is not required to present statistical evidence to support a claim of disparate impact.

b. <u>A Jury Could Reasonably Find Mills is Disabled Under the ADA</u>

Union Pacific next contends that Mills cannot maintain a disparate impact claim because he has no "actual disability" Dkt. 29-1, at 18. Rather, it argues, Mills has only ever been "regarded as" having a disability. *Id.* at 18–19. Union Pacific implies that individuals who are only "regarded as" having a disability are not protected under the ADA. Thus, Mills' termination could not have had a discriminatory impact on an individual in an ADA-protected group.

This argument is creative, but ultimately unsound. The federal regulations implementing the ADA define "disability" in part as "[*b*]*eing regarded as* having [a physical or mental impairment] . . . whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." 29 C.F.R. § 1630.2(g)(1)(iii), (l)(1) (emphasis added). Thus, because Union Pacific acknowledges that Mills was "regarded as" disabled, and because Mills asserts that he is disabled, Union Pacific's argument that Mills falls short of the statutory definition is unavailing and serves as an insufficient ground for summary judgment.

c. <u>Union Pacific Has Not Shown That Its Use of the Light Cannon is</u>
<u>Justified by Business Necessity</u>

Finally, Union Pacific claims that even if Mills may appropriately be considered disabled, its use of the Light Cannon is consistent with business necessity. Dkt. 29-1, at 19. A business necessity defense requires an employer to show: (1) the contested qualification standard is job-related, (2) the contested qualification standard is consistent with business necessity, and (3) performance cannot be accomplished by reasonable accommodation. 42

U.S.C. § 12113(a); *Bates*, 511 F.3d at 995. "To show job-relatedness, an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Id.* at 996 (cleaned up). "To show that the disputed qualification standard is consistent with business necessity, the employer must show that it substantially promotes the business's needs." *Id.* (cleaned up). Finally, to satisfy the reasonable accommodation prong, an employer must show that "no reasonable accommodation currently available would cure the performance deficiency or that such reasonable accommodation poses an undue hardship on the employer." *Id.* at 996–97 (cleaned up).

Here, Union Pacific's primary support for its assertion of the business-necessity defense is the already-addressed argument that use of the Light Cannon is mandated by the FRA. Dkt. 29-1, at 18–19. It claims that if use of the Light Cannon is federally mandated, then it must be job-related, it must promote business needs, and there must be no reasonable accommodation available. *Id.* However, as discussed above at length, the FRA's color-vision-testing requirements do not mandate use of the Light Cannon.

Union Pacific also supports its business-necessity defense by analogizing to a recent Fourth-Circuit case, *Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332 (4th Cir. 2022). There, an engineer claimed that a railroad company violated the ADA by terminating him when he failed to produce his medical records following his involvement in a train wreck and his testing positive for amphetamines. *Id.* However, the regulations at issue in *Coffey* "extensively regulate[] the use of controlled substances by railway employees," and "impose on railroads . . . a duty to exercise due diligence to assure compliance by each

employee." *Id.* at 388 (cleaned up); *see e.g.*, 49 C.F.R. §§ 219.101(a), 219.102, 219.103(a), 219.105. Thus, the railway's request for the engineer's medical records may be appropriately understood as mandated by federal regulation. The same cannot be said for Union Pacific's use of the Light Cannon.

Union Pacific has not conclusively shown that the Light Cannon fairly and accurately measured Mills' actual ability to perform the essential functions of his job. Nor has it shown that no reasonable accommodation currently available for Mills would cure his performance deficiency. Accordingly, summary judgment on the basis of a business-necessity defense is inappropriate.

### C. Union Pacific's Motion to Strike

In his response to Union Pacific's Motion for Summary Judgment, Mills briefly references the Independent Medical Record Review (the "Report") (Dkt. 35-4) of two expert witnesses, Dr. Neitz and Dr. Trangle (the "Doctors"). Dkt. 35, at 10–11. Dr. Trangle is a Doctor of Occupational Medicine and Dr. Neitz is a Professor of Ophthalmology who researches color vision and vision disorders. Dkt. 27, at 4. The Doctors were retained by Mills' counsel to opine on whether the Light Cannon screens out individuals who, despite some color vision deficiency, could nevertheless safely work as conductors. Dkt. 35, at 8. Mills attached the Report to his Response at Dkt. 35-4.

Union Pacific now moves the Court to strike from the record both the Report and any reference thereto in Mills' Response. Dkt. 40-1, at 2. It claims that the Report is nothing more than a transmitter of testimonial hearsay, as prohibited under Fed. R. Evid. 703, and that the opinions of the Doctors constitute foundationless speculation, as prohibited under

Fed. R. Evid. 702. *Id.* at 2–6. The Court addresses these arguments in turn.

*1. Transmission of Testimonial Hearsay*

The Doctors' opinion, as outlined in the Report, relies in part on a scientific study conducted by Dr. Jeff C. Rabin. Dkt. 35-4, at 11. Dr. Rabin's study, at least as the Doctors understand it, suggests that the Light Cannon fails many individuals who could safely operate trains. *Id.* at 11–12.

Union Pacific asserts that, instead of reaching any independent conclusions of their own, the Doctors have simply repackaged Dr. Rabin's report, and offered it as their own opinion. Dkt. 40-1, at 2–3. It bolsters this claim by pointing to the fact that neither Doctor has conducted any personal research on the Light Cannon, or even so much as seen a Light Cannon administered. *Id.*

As stated above, expert testimony need not be based on personal knowledge. Rather, experts are permitted to rely on facts that other experts in a particular field would rely upon. *Swope*, 2019 WL 1781405, at *4. This means it was not necessary for the Doctors to personally study, or even witness, the Light Cannon in operation. Further, because there is no indication or argument from Union Pacific that Dr. Rabin's study is untrustworthy, the Court can conclude—at least preliminarily—that experts in the field of color-vision testing could reasonably rely on the study.[2]

Whether the Doctors have applied their training and experience to the sources before them to reach an independent judgment is something of a closer question. However, upon

---

[2] According to the Report, a draft of Dr. Rabin's study has been prepared for peer-reviewed publication. Dkt. 35-4, at 11.

consideration, the Court finds that they have. While the Doctors certainly incorporate the findings of Dr. Rabin's study into their analysis, their analysis is also the product of an exhaustive review of Mills' history of color vision tests and his Union Pacific work safety records. That the Doctors applied their own training and experience to the sources at hand is also evident in their discussion of color-vision testing generally, and their interpretation of Mills' results. Dkt. 35-4, at 10–11, 14. Therefore, the Court finds that the challenged opinions are more than mere transmissions of testimonial hearsay, and this first challenge by Union Pacific fails.

### 2. Foundationless Speculation

Union Pacific next argues that the Doctors' conclusions are not based on sufficient facts or data so as to be admissible under Rule 702. *See* Fed. R. Evid. 702(b). In the Report, the Doctors assert that the Light Cannon, as it was administered to Mills, "fails anomalous trichromats [that is, individuals with slight color vision defects] who are able to safely do their duties on the railroad." Dkt. 35-4, at 11. They also opine that Mills is able to "safely distinguish colors necessary" for railroad work. *Id.* at 14. Union Pacific contends that neither of these conclusions have a suitable factual basis. Dkt. 45, at 3–5.

In addition to the standards described at the outset of this Order, the Court emphasizes here that, in resolving *Daubert* challenges, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 960–70 (9th Cir. 2013). Further, the Ninth Circuit has made clear that the facts or data required by Rule 702 may consist of the specialized knowledge and experience of the

testifying expert. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

Here, the Doctors' opinion regarding the propensity of the Light Cannon to fail anomalous trichromats who are otherwise qualified for railroad duties is based on their review of Dr. Rabin's study, their analysis of Mills' medical and work history, and their specialized knowledge regarding anomalous trichromats. While such a factual foundation is certainly not unassailable through cross examination and contrary evidence, it clearly exists, despite Union Pacific's contentions to the contrary. The Court finds that such testimony has substance enough to be helpful to a jury—even if it is not dispositive of the central issues in this case.

The same is true regarding the Doctors' opinions about Mills' color vision. Union Pacific argues that none of the evidence reviewed by the Doctors could inform them regarding Mills' color vision in 2016. Dkt. 45, at 4. However, the Report makes clear that the Doctors performed a diligent review of Mills' entire history of color vision testing with Union Pacific. While it is true that one's vision may change or worsen over time, this possibility alone does not make Mills' test history irrelevant. When that history is combined with a review of Mills' accident-free work history, and the Doctors' individual expertise in ophthalmology and occupational medicine, the result is a factual basis that is clearly sufficient to admit the Doctors' testimony. To the extent Union Pacific sees flaws in the methodology behind this testimony, again, it can raise them on cross examination.

### D. Union Pacific's Objection

On October 10, 2023, Mills filed a Notice of Supplemental Authority with the Court. Dkt. 46. Union Pacific objected to that filing days later. Dkt. 48. The "authority" Mills

hopes to bring to the Court's attention is a federal complaint, recently filed by the EEOC against Union Pacific in Minnesota. Dkt. 46-1. That complaint, much like Mills' Complaint here, alleges that Union Pacific's use of the Light Cannon violates the ADA. *Id.* While the Court will certainly be interested to see how that litigation plays out, the mere filing of a complaint does nothing to inform the Court on how it should handle Mills' case. Additionally, while parties are free to file notices of supplemental authority, a complaint is not an authority. Therefore, the Court sustains Union Pacific's objection. Mills' Notice (Dkt. 46) will be stricken from the record.

## V. CONCLUSION

In summary, the Court finds that, because the testimony of Steven Fender could inform the fact finder on relevant issues, the testimony is admissible. The Court, therefore, DENIES Mills' Motion in Limine (Dkt. 26). For the reasons outlined above, the Court finds that questions of material fact preclude an entry of summary judgment. It therefore DENIES Union Pacific's Motion for Summary Judgment (Dkt. 29). Additionally, the Court finds that Mills' experts have applied their expertise to the materials before them and have based their opinions on a sufficient factual basis to avoid preclusion under Rules 702 and 703. Accordingly, the Court DENIES Union Pacific's Motion to Strike (Dkt. 40). Finally, the Court finds that Mills' proffer of a recently filed suit against Union Pacific does not qualify as supplemental authority. Thus, the Court SUSTAINS Union Pacific's Objection (Dkt. 48). The Notice (Dkt. 46) will be stricken from the record.

///

///

## VI. ORDER

**IT IS HEREBY ORDERED**:

1. Mills' Motion in Limine (Dkt. 26) is **DENIED**.

2. Union Pacific's Motion for Summary Judgment (Dkt. 29) is **DENIED**.

3. Union Pacific's Motion to Strike (Dkt. 40) is **DENIED**.

4. Union Pacific's Objection (Dkt. 48) is SUSTAINED. Mills' Notice of Supplemental Authority (Dkt. 46) will be stricken from the record.

DATED: January 16, 2024

David C. Nye
Chief U.S. District Court Judge