UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

MONTE MILLS,

Plaintiff,

v.

UNION PACIFIC RAILROAD COMPANY,

Defendant.

Case No. 1:22-cv-00143-DCN

**MEMORANDUM DECISION AND ORDER**

## I. INTRODUCTION

Before the Court is Defendant Union Pacific's Renewed Motion for Judgment as a Matter of Law. Dkt. 142. Union Pacific asks the Court to enter judgment as a matter of law in its favor after a jury determined it was liable for terminating Plaintiff Monte Mills in violation of the Americans with Disabilities Act ("ADA"). Because the Court disagrees with Union Pacific's legal arguments, because substantial evidence supported the jury's verdict, and for the reasons explained more fully below, the Court DENIES Union Pacific's Motion.[1]

## II. BACKGROUND

Plaintiff Monte Mills was hired by Defendant Union Pacific in 2004. Shortly after being hired, Union Pacific tested Mills's color vision according to regulations established

[1] The Court finds the facts and legal arguments are adequately presented and will decide the Motion on the record and without oral argument. Dist. Idaho Loc. Civ. R. 7.1(e)(1)(B).

by the Federal Railroad Administration ("FRA").

FRA color vision testing requirements proceed in two stages: first, the railroad employee is shown a scientifically validated test known as the Ishihara. The Ishihara test is effective at identifying people with any degree of color vision deficiency, but provides relatively little information on how severely a person is impacted by their color vision deficiency. So, when a railroad employee fails the Ishihara, the FRA requires railroads to conduct follow-on testing to determine whether the employee's particular color vision deficiency will impact their ability to accurately identify railroad signals as a practical matter.

Although Mills failed the Ishihara, he passed his 2004 follow-on testing, and began serving as a locomotive engineer sometime in 2007 or 2008. But FRA regulations require railroads to recertify their locomotive engineers every three years. So in 2007, 2010, and 2013, Mills again underwent color vision testing. Each time he failed the Ishihara, and each time he took Union Pacific's follow-on field test—that is, a test designed to assess whether he could correctly identify signals under real-world conditions. For each of those tests, Mills's field test consisted of a ride along with management where only Mills would call out signals on a 60 mile stretch of railroad. And each time, Mills passed.

Between 2013 and 2016, however, Union Pacific's field test changed. In 2012, just outside Goodwell, Oklahoma, two Union Pacific freight trains collided after one train missed a signal. The "Goodwell incident"—as the collision will forever be known in the railroad industry—prompted a National Transportation Safety Board ("NTSB") investigation. The NTSB report found that the eastbound train's engineer, who had suffered

severe degradation in his vision (including his color vision) prior to the accident, missed or incorrectly interpreted a railroad signal. The NTSB's report made several recommendations to railroads. Among them: railroads should redevelop their color vision field tests.

Between 2013 and 2016, Union Pacific developed its new field test, called the "CVFT," "Light Cannon CVFT", or simply the "Light Cannon." The Light Cannon shares little resemblance with Union Pacific's old field test. The testing equipment (the Light Cannon proper) consists of a black metal box elevated to eye level by a stand. A railroad signal is set in each lateral face of the box, along with a shader to protect the signal from solar glare. The box can pivot on the stand, so that an operator can direct each signal at an observer. The testing protocol requires the employee to stand a quarter mile away from the Light Cannon, together with representatives of labor and management. Another test administrator stands with the Light Cannon. During the test, the administrator at the Light Cannon sets a signal, activates it, rotates the box to set a new signal (or does not rotate the box to test the same signal twice), and activates it again. Each light is active for three seconds before turning off automatically, and the employee is shown twenty signals during the test. A management scorekeeper records the employee's initial response to each signal. Failure to correctly identify any of the twenty signals constitutes failure. The exact features of the final Light Cannon were established after Union Pacific considered the reports of Drs. Douglas Ivan and Jeff Rabin, which offered critiques and recommendations of the Light Cannon's initial design.

In 2016, Mills was tested using the Ishihara and failed, as he had every time he had taken it. When Mills was administered the Light Cannon, however, he missed five lights. Based on his failure at the Light Cannon, Mills was denied FRA certification, which rendered him ineligible to serve as a locomotive engineer. Mills appealed to Union Pacific's then-chief medical officer, Dr. John Paul Holland, but Dr. Holland found Mills medically unfit as a result of his Light Cannon results. Mills initially appealed his determination to the FRA, but eventually abandoned that appeal.

Instead, Mills filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging he had been terminated in violation of the ADA. Although EEOC files include a right-to-sue letter dated January 2021, Mills denies he ever received the letter.

Mills filed this action just over one year later. Dkt. 1. After the close of discovery, Union Pacific sought summary judgment, arguing Mills's claims were time barred because he filed suit more than 90 days after the January 2021 EEOC right-to-sue letter was issued, because (it argued) Mills was not a qualified individual under the ADA because he could not have been certified under the FRA regulations, and because its use of the Light Cannon was justified by business necessity. *See generally* Dkt. 29.

The Court rejected each of Union Pacific's arguments. The Court found that because Mills denied ever receiving the right-to-sue letter, the mailbox rule applied, and Union Pacific would have to introduce evidence at trial (other than the date on the letter itself) to raise the presumption that Mills received the right-to-sue letter. Dkt. 56, at 15–19. The Court also found that FRA regulations were not dispositive on the issue of whether Mills was a qualified individual under the ADA, *id.* at 19–24, and found genuine disputes of fact

regarding whether the Light Cannon was justified by business necessity, *id.* at 28–30. The Court then set the matter for trial. Dkts. 61, 64.

Trial opened on October 27, 2025. Dkt. 103. Mills introduced his own testimony, as well as testimony from his union representatives, Ted Van Horn and Ross Cunningham, regarding work on the railroad, the Light Cannon, and Mills's experience during the test and thereafter. Mills also introduced the testimony of his wife to show damages. Finally, Mills introduced the testimony of two experts, Drs. Jay Neitz and Kevin Trangle, who testified as to color vision deficiency generally, Mills's experience with it, and the Light Cannon's alleged flaws. Union Pacific introduced evidence from Union Pacific manager Brandi Shultz and executives Carl Garrison, Dr. Holland, and Rodney Doerr.

At the close of Mills's case, Union Pacific moved to dismiss and for judgment as a matter of law under Rule 50(a). Union Pacific argued, in its motion to dismiss, that by denying he ever received a right-to-sue letter from the EEOC, Mills had inadvertently admitted his suit was premature under the ADA. And in moving for judgment as a matter of law, Union Pacific argued Mills could not be found qualified because the evidence did not show he could pass any color vision field testing in 2016 or at any point thereafter and because he had not exhausted his administrative remedies under the FRA appeals system. The Court took both motions under advisement.

At the close of all evidence, both parties moved for judgment as a matter of law. The Court denied Mills's motion, granted Union Pacific's motion as to punitive damages, and reserved judgment on the balance of Union Pacific's motion (which sought judgment as a

matter of law on its business necessity defense). The Court then submitted the case to the jury.

The jury found Union Pacific violated the ADA when it terminated Mills and awarded him $767,842.18 in backpay. Dkt. 113.

Union Pacific now renews its motions for judgment as a matter of law, and provides additional briefing on its mid-trial motion to dismiss. Dkt. 142. Mills responded, Dkt. 145, and Union Pacific replied, Dkt. 148. After briefing concluded, Union Pacific filed a notice of supplemental authority, which the Court has also reviewed. Dkt. 149.

The motion is now ripe for review.

## III. LEGAL STANDARD

Judgment as a matter of law, under Federal Rule of Civil Procedure 50(b), is appropriate when "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (citation modified). Thus, "[a] motion for a judgment as a matter of law is properly granted only if no reasonable juror could find in the non-moving party's favor." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008) (citation modified). The Court must view the evidence "in the light most favorable to the nonmoving party, with all reasonable inferences drawn in favor of that party." *Id.* at 1205–06.

Importantly, "[a] Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion." *Go Daddy Software, Inc.*, 581 F.3d at 961. The Ninth Circuit has explained the Rule 50 scheme as follows:

> Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b). Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.

*Id.* (citation modified).

When the grounds for a Rule 50(b) motion were properly asserted in a Rule 50(a) motion, the substantial evidence standard applies: "A jury's verdict must be upheld if it is supported by substantial evidence . . . , even if it is also possible to draw a contrary conclusion from the same evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007) (citation modified).

## IV. DISCUSSION

### A. Was Mills a Qualified Individual?

To prevail on his case in chief, Mills must have shown by a preponderance of the evidence that he was a qualified individual. *See* 42 U.S.C. § 12112. "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To succeed on this portion of its renewed motion for judgment as a matter of law, Union Pacific must show that no reasonable juror could have concluded, by a preponderance of the evidence, that Mills was a qualified individual.

#### *1. Evidence of FRA Certifiability*

Union Pacific argues Mills failed to prove he was a qualified individual because he

did not introduce evidence showing he could have passed the color visions acuity tests mandated by 49 C.F.R. § 242.117 and 49 C.F.R. Part 242 Appendix D—in 2016 or thereafter. Citing the Supreme Court's decision in *Albertson's v. Kirkinburg*, 527 U.S. 555 (1999) and district court decisions in *Blankinship v. Union Pacific R.R.*, 2024 WL 5187689 (D. Ariz. Dec. 20, 2024) and *Donahue v. Union Pacific R.R.*, 2025 WL 1397505 (N.D. Cal. May 13, 2025), Union Pacific insists Mills was required to show he could satisfy the FRA's qualification standards to prove he was a qualified individual. Since Mills did not introduce any such evidence, Union Pacific is entitled to judgment as a matter of law if it is correct.

In determining whether a person is a qualified individual, the law distinguishes between "essential functions" and "qualification standards." In its landmark *Bates* decision, the Ninth Circuit explained the difference:

> "Essential functions" are not to be confused with "qualification standards," which an employer may establish for a certain position. Whereas "essential functions" are basic "duties," 29 C.F.R. § 1630.2(n)(1), "qualification standards" are "personal and professional attributes" that may include "physical, medical [and] safety" requirements. *Id.* § 1630.2(q). The difference is crucial. The statute does not require that a person meet each of an employer's established "qualification standards," however, to show that he is "qualified."

*Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007). To use the *Bates* case as an example, the ability to drive a delivery truck safely is an essential function, but hearing above a certain threshold is a qualification standard. *Id.* at 992. "[T]he ADA generally requires individualized assessment of whether a qualified individual is able to perform essential functions with or without reasonable accommodation, rather than use of blanket qualification standards . . . as substitute for such individualized determination." *Id.*

at 993.

The law does not absolutely forbid employers from using qualification standards to screen out individuals who cannot perform the essential functions of the job. But the law generally places the burden on the employer to justify its qualification standards under the business necessity defense. 42 U.S.C. § 12113. This distribution of burdens makes sense: the ADA claimant must prove that he or she was capable of doing the job in the abstract, but the employer—which is in the best position to research, develop, implement, and justify its use of a particular qualification standard—must show its qualification standard is consistent with a business necessity.

When the Government sets a qualification standard which employers must implement, however, the analysis becomes more difficult. Is it the employer's job to justify the *Government's* chosen qualification standards? And if the answer is no, when—if ever—is the employer required to justify, under the ADA, its discretionary failure to apply a particular exception?

The Supreme Court addressed those questions in *Albertson's v. Kirkinburg*. There, a commercial truckdriver sued Albertson's under the ADA after Albertson's found Kirkinburg failed to meet Department of Transportation ("DOT") visual acuity standards. 527 U.S. at 560–61. Kirkinburg argued employers must justify legally mandated qualification standards under the business necessity defense, and the Supreme Court disagreed. *Id.* at 577. The Supreme Court held employers are not generally required to prove that qualification standards established by the Government comport with the ADA—rather, employees must show they can meet the Government's qualification standards to

prove they are qualified individuals. *See id.*

Kirkinburg's second argument fared no better, but the Court's analysis suggests *Albertson's* holding is distinguishable from this case. Even if Albertson's was not obligated to justify the Government's qualification standards as a business necessity, Kirkinburg contended, it was still required to comply with the ADA with respect to its decision declining to participate in an experimental DOT waiver program. The waiver program was "a scheme . . . for giving DOT certification to applicants with deficient vision" if they had an otherwise safe driving record and agreed to provide data to the DOT. *Id.* at 560. But, in finding that Albertson's did not have to justify its unwillingness to participate in the waiver program under the ADA, the Supreme Court focused on what the waiver program was *not*.

The waiver program did not "modify[] the content of the basic visual acuity standard in a way that disentitled an employer like Albertson's to insist on it." *Id.* at 571. It did not "establish a comparable substantive standard . . . grounded on known facts indicating at least that safe operation would not be jeopardized." *Id.* at 573. The DOT office responsible for implementing the waiver program "made it clear that it had no evidentiary basis for concluding that the pre-existing standards could be lowered consistently with public safety." *Id.* at 574. Rather, the waiver program was purely experimental. "In sum," the Court wrote,

> the regulatory record made it plain that the waiver regulation did not rest on any final, factual conclusion that the waiver scheme would be conducive to public safety in the manner of the general acuity standards and did not purport to modify the substantive content of the general acuity regulation in any way. The waiver program was simply an experiment with safety, however well intended, resting on a hypothesis whose confirmation or refutation in practice would provide a factual basis for reconsidering the

> existing standards. Nothing in the waiver regulation, of course, required an employer of commercial drivers to accept the hypothesis and participate in the Government's experiment.

*Id.* at 576–77. Because the waiver program was an experimental opt-out rather than a mandatory regulatory entitlement to individualized assessment, the *Albertson's* Court held the employers did not have to justify their decision not to participate in the waiver program under the ADA. *Id.*

In short, the Supreme Court held that when "[t]he validity of [the] regulations is unchallenged, they have the force of law, and they contain no qualifying language about individualized determinations," employees bear the burden of showing they meet those regulations to establish they are qualified individuals. *Id.* at 570. But the Supreme Court left open situations where regulations *do* require employers to make individualized determinations as part of a holistic regulatory standard. *Cf. Equal Emp. Opportunity Comm'n v. Drivers Mgmt., LLC*, 142 F.4th 1122, 1136–37 (8th Cir. 2025) (finding *Albertson's* distinguishable because, in the intervening years, the DOT has made the waiver program a permanent, mandatory aspect of its regulatory scheme).

So, is the FRA certification program here analogous to the DOT regulations in *Albertson's*? In important respects, no. Under the FRA's relevant regulations, "[e]xcept as provided in paragraph (j) of [49 C.F.R. § 242.117], each person shall have visual acuity that meets or exceeds the following thresholds: . . . (3) The ability to recognize and distinguish between the colors of railroad signals as demonstrated by successfully completing one of the tests in appendix D to this part." 49 C.F.R. § 242.117(h). Appendix D, in turn, provides: "In determining whether a person has the visual acuity that meets or

exceeds the requirements of this part, the following testing protocols are deemed acceptable testing methods for determining whether a person has the ability to recognize and distinguish among the colors used as signals in the railroad industry." 49 C.F.R. part 242 app'x D(2). Paragraph 2 of Appendix D includes a chart listing several scientific tests designed to screen for color vision deficiency. *Id.*

But if a person subject to FRA certification fails the initial tests, the certification is not necessarily denied: "An examinee who fails to meet the criteria in the chart, may be further evaluated as determined by the railroad's medical examiner. Ophthalmologic referral, field testing, or other practical color testing may be utilized depending on the experience of the examinee." 49 C.F.R. part 242 app'x D(4). "If, after consultation with a railroad officer, the medical examiner concludes that, despite not meeting the threshold(s) in paragraphs (h) and (i) of this section, the person has the ability to safely perform as a conductor, the person may be certified as a conductor . . . ." 49 C.F.R. 242.117(j). As the Court noted at summary judgment, then, FRA regulations give railroads substantial discretion to develop the tests used to determine whether an individual satisfies the FRA's ultimate standard ("the ability to safely perform") and to interpret those test's results. Dkt. 56, at 13, 19–20.

*Albertson's* is thus distinguishable thrice over. The objective qualification standards—passing the initial color vision field tests at 49 C.F.R. part 242 app'x D(2)—are not legally mandatory for FRA certification; the exact form of follow-up field testing is not specified in regulations which have the force of law; and the regulations here *do* contain "qualifying language about individualized determinations." *Cf. Albertson's*, 527

U.S. at 570. Because Union Pacific has discretion to develop its field tests and to interpret the results, Union Pacific must justify its choices under the ADA's business necessity defense. *Albertson's* reasoning does not imply—let alone require—a contrary holding.

So, field testing is attributable to Union Pacific, not the Government, and the usual distribution of burdens described in *Bates* applies. Metrics for determining the nature and extent of Mills's color vision deficiency are "qualification standards" rather than "essential functions."[2] In proving that he could safely perform as an engineer, Mills was not required to submit evidence that he could pass any of the threshold or subsequent testing. Mills *did* bear the burden of showing that he could meet the essential functions of a locomotive engineer. The only finding a railroad must make to issue an FRA certification is that a person can "safely perform as a conductor" (or, in this case, as a locomotive engineer). The railroad may make that determination even if a person fails the threshold tests described in 49 C.F.R. part 242 appendix D(2). 49 C.F.R. § 242.117(j). Thus, the jury could reasonably have concluded the "essential function" of a locomotive engineer is to safely perform as an engineer. *See Bates*, 511 F.3d at 991 n.7 (the determination of essential functions is a question of fact for the jury).

Mills introduced sufficient evidence, at trial, for a reasonable juror to conclude that

[2] For this reason, the Court disagrees with the District of Arizona's holding in *Blankinship*. There, the district court granted summary judgment because the ADA plaintiff failed to present evidence that he could satisfy FRA color vision acuity standards. 2024 WL 5187689, at *5. But passing the FRA's threshold color vision acuity standards are not a mandatory prerequisite for FRA certification, so *Albertson's* rationale is not applicable to the threshold FRA requirements. And the field tests were not developed or mandated by the Government, so *Albertson's* rationale is not applicable to the field testing, either. With the exception of blanket qualification standards developed and mandated by the Government, ADA plaintiffs do not have to show they can pass a particular qualification standard to show they are a qualified individual. *See Bates*, 511 F.3d at 990–91.

he could safely perform the duties of a locomotive engineer. Mills introduced evidence that he had previously passed a follow-on scientific test which the jury could have reasonably inferred was the scientifically-validated Optec 900 test. Trial Tr. Vol. II, at 174–75, 264–65.[3] Mills's testimony and the testimony of his coworkers indicated he had never been the subject of complaints, had never incorrectly called a railroad signal, and that his coworkers credited his years of experience in concluding he was a safe engineer. *See, e.g.*, Trial Tr. Vol. 1, 103–04; Vol. II, at 269. The jury further heard expert testimony that the kind of color vision deficiency Mills's possesses does not impact one's ability to see railroad signals and would not degrade over time. Trial Trans. Vol. II, at 171–72; 177; Vol. III, at 410–12. The jury also heard testimony that several layers of redundancy were built into the railroad signal interpretation system: locomotive engineers work as a team with conductors to call and discuss railroad signals, dispatch may call a train by radio, and positive train control alerts conductors and engineers in case the train is moving too fast. Trial Tr. Vol. I, at 76–77.

Union Pacific argues Mills introduced nothing more than evidence of his past performance, and that such evidence is insufficient to show he was presently qualified, citing *Donahue v. Union Pac. R.R.*, 2025 WL 1397505, at 6 (N.D. Cal. May 13, 2025). *Donahue*, however, relies on *Blankinship*, which the Court does not believe correctly allocates the burden on FRA color vision qualification standards. *See supra*, n.2. Moreover,

---

[3] The parties disputed at trial whether admissible testimony indicated Mills took the Optec 900 test specifically, but the jury could have inferred from Mills's description of his testing and Dr. Jay Neitz's description of the Optec 900 that Mills was tested with the Optec 900.

Mills did not introduce *only* evidence of his past performance: he paired it with evidence that his particular kind of color vision deficiency would not degrade over time, mitigating the need for present evidence. *See, e.g.*, Trial Trans. Vol. II, at 171–72; 177; Vol. III, at 410–12. *Donahue* is thus distinguishable.

*2. FRA Appeals Exhaustion*

Union Pacific's final argument regarding Mills's qualified individual status is that Mills was required to exhaust his administrative remedies with the FRA, either before bringing suit or to be considered a qualified individual. Under binding Ninth Circuit authority, the FRA appeals regime is optional (an aggrieved employee may, but is not required to, file an FRA appeal) and nonexclusive (an aggrieved employee may file claims under the Railway Labor Act, under a collective bargaining agreement, or at common law, for instance). *Carpenter v. Mineta*, 432 F.3d 1029, 1031–32, 1035 (9th Cir. 2005) (citing 49 C.F.R. § 240.5). Ninth Circuit district courts have relied on *Carpenter* to reject the premise that plaintiffs must exhaust their administrative remedies under FRA regulations before filing suit under the ADA. *See, e.g.*, *DeFries v. Union Pac. R.R.*, 2025 WL 1029283, at *7–8 (D. Or. Mar. 7, 2025), *on reconsideration in part,* 2025 WL 2193936 (D. Or. July 31, 2025).

Union Pacific explains its argument here is distinguishable from *DeFries* because there, the exhaustion issue was framed as a subject matter jurisdiction problem, whereas here, Union Pacific frames it as a precondition to being a qualified individual. Dkt. 142-1, at 25–27. It is true that *DeFries* addressed Union Pacific's argument under the rubric of subject matter jurisdiction. *DeFries*, 2025 WL 1029283, at *7. In *DeFries*, Union Pacific

argued that railroad employees were required to pursue the FRA certification appeal process. Because that process results in a final agency action, Union Pacific argued, the only avenue for railroad employees to contest an FRA certification decision in federal court was through 28 U.S.C. § 2342, which confers exclusive jurisdiction over challenges to final agency action on the courts of appeals.

The Court finds Union Pacific's attempt to distinguish *DeFries* fails for two reasons. First, the logical consequence of Union Pacific's exhaustion argument would be exactly the proposition *DeFries* rejected: it would deprive the Court of jurisdiction over the issue of whether Mills was a qualified individual. If Mills were required to exhaust his administrative remedies regarding FRA certification to prove he was a qualified individual, the FRA Administrator would produce a final agency action. *See Carpenter*, 432 F.3d at 1032. The court of appeals would then have exclusive jurisdiction to review that action under the Administrative Orders Review Act. *See* 28 U.S.C. § 2342(7); 49 U.S.C. § 20114(c). Union Pacific is simply restating its *DeFries* argument without stating the necessary logical inference: an exhaustion requirement here would effectively require Mills to litigate his qualified individual status before the FRA and then the court of appeals rather than in this Court. The Court rejects that premise for the same reasons the *DeFries* court rejected Union Pacific's argument there. *See DeFries*, 2025 WL 1029283, at *7–12.

The Court also rejects that premise for another reason: Mills claims the portions of the FRA certification process which were committed to Union Pacific's discretion were illegitimate and void under *the ADA*, not under FRA regulations. That question involves issues of statutory construction beyond the FRA's institutional competency. The FRA has

no special expertise with respect to the ADA. *Cf. POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 118–20 (2014) (declining to find the FDCA implicitly precludes a Lanham Act suit in part because the FDA does not have authority to enforce the Lanham Act). And statutory construction generally is the province of courts, not agencies. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). Mills was not required to exhaust his administrative remedies when those FRA proceedings could not have addressed his sole argument: that Union Pacific's Light Cannon violated the ADA and thus had erroneously found him unable to safely serve as a locomotive engineer. *See DeFries*, 2025 WL 1029283, at *10 (noting that ADA challenges to railroad-developed field tests do not challenge FRA regulations or an FRA decision); *see also Gibson v. Berryhill*, 411 U.S. 564, 575 (1973) (declining to apply prudential exhaustion in the *Ex parte Young* context where adequacy of administrative remedies depended on the merits of the plaintiffs' lawsuit).

Union Pacific cites several cases in support of its exhaustion argument. *See* Dkt. 142-1, at 17–24; *see also* Dkt. 149. But the lone case from this circuit—*Marshall v. Gordon Trucking, Inc.*—does not even concern the FRA's remedial scheme. 215 F. Supp. 3d 1036, 1040–41 (D. Or. 2016). To the extent *DeFries* grapples with this circuit's precedents regarding the FRA remedial scheme, the Court finds it more persuasive than Union Pacific's out of circuit authority.

In sum, the Court rejects Union Pacific's argument that Mills was required to introduce evidence that he could meet FRA color vision acuity standards, and it further rejects Union Pacific's exhaustion argument. Accordingly, the Court finds that the jury could have reasonably concluded that Mills was a qualified individual by a preponderance

of the evidence. Union Pacific's Motion is DENIED in these respects.

**B. Was Mills's Claim Time Barred under the ADA?**[4]

Union Pacific next argues Mills's claim must be dismissed as time barred under the ADA because he claims he never received his right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"). Union Pacific argues that Mills could not file suit unless he physically possessed a right-to-sue letter at some point.

To file suit under the ADA, claimants must navigate a complex set of pre-suit requirements and deadlines. First, the claimant must file a charge with the EEOC (or appropriate state agency) within the time limits specified by 42 U.S.C. § 2000e-5(e)(1). The EEOC has, in theory, 180 days to dispose of the charge.

If the EEOC issues a right-to-sue letter within that 180-day window, the claimant must file suit within 90 days after receiving the letter. 42 U.S.C. § 2000e-5(f)(1). If the EEOC fails to act within 180 days, the claimant is deemed to have exhausted his administrative remedies and may demand the EEOC issue a right-to-sue letter. *Scott v. Gino Morena Enters., LLC*, 888 F.3d 1101, 1109 (9th Cir. 2018) (citing *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1104 (9th Cir. 2008)). Alternatively, the claimant can file suit immediately, without waiting for the right-to-sue letter. *Stiefel v. Bechtel Corp.*, 624 F.3d

---

[4] At trial, Union Pacific moved to dismiss based on Mills's contention that he never received the right-to-sue letter. Trial Tr. Vol. III, at 480. In the interest of judicial economy, and in light of the already-underway jury trial, the Court reserved ruling on Union Pacific's Motion until after the trial concluded. Trial Tr. Vol. III, at 487. Mills now objects to the propriety of Union Pacific re-briefing the issue in its Rule 50(b) motion. Dkt. 145, at 18. Because the additional briefing does not alter the Court's analysis, and because Mills had sufficient opportunity to address any new arguments in his opposition to Union Pacific's Rule 50 motion, the Court overrules Mills's objection to the propriety of considering Union Pacific's additional briefing.

1240, 1245 (9th Cir. 2010).[5] If the EEOC issues a letter in response to a demand, the usual 90-day limit applies, running as usual from the date of receipt. *See Lynn v. W. Gillette, Inc.*, 564 F.2d 1282, 1283–84, 1286 (9th Cir. 1977) (claimants had 90 days from the date they received their notice of right to sue, even though the notice was issued more than two years after the charge was filed).

The parties in this case dispute whether Mills received the notice *at all*, and if he did not, what that means for the 90-day limit. The Court addressed the first issue at summary judgment. Union Pacific argued Mills failed to sue within 90 days of receiving his notice of right-to-sue, and Mills denied ever receiving the notice. Dkt. 56, at 15–16. The Court held that when a party asserts the opposing party received a letter, and the opposing party denies receipt, the party asserting receipt can raise a rebuttable presumption that the opposing party received the letter under the mailbox rule—*if* the party asserting receipt introduces evidence that the letter was mailed. *Id.* at 17. Since Union Pacific did not introduce any evidence of mailing (other than the legally insufficient date on the notice itself), it was not entitled to summary judgment on its ADA time bar argument. *Id.* at 19.

Union Pacific could have attempted to raise the mailbox rule again at trial by introducing additional evidence that the notice was mailed on the date listed thereon. It did not do so. Instead, Union Pacific argued that Mills's *failure to receive a notice*, if true, precluded him from filing suit. It is that argument Union Pacific renews now.

---

[5] Union Pacific disputes this premise, arguing that a right-to-sue letter must be received before an ADA claimant can file suit, period. Dkt. 142-1, at 29. But it relies heavily on out of circuit cases, and none of the controlling cases it cites post-date *Steifel*. To the extent Union Pacific's authorities hold, contra *Steifel*, that a plaintiff must have a right-to-sue letter in hand prior to filing suit, those authorities are either overruled by *Steifel* or in conflict with controlling circuit authority.

Union Pacific's argument is squarely foreclosed by the Ninth Circuit's decision in *Scott*. There, the Ninth Circuit discussed dicta from *Stiefel*, 624 F.3d at 1240, which seemed to imply that a plaintiff must sue within 90 days of *either* receiving a notice of right-to-sue *or* the 180th day after filing a charge. 888 F.3d at 1109. The *Scott* court rejected *Steifel*'s dicta, holding that ADA claimants "*may* sue when the EEOC has not acted on a charge for 180 days but is not *required* to do so until after receiving a right-to-sue notice." *Id.* at 1110.

The Ninth Circuit acknowledged that its rule may allow for greatly expanded times for filing suit under the ADA, but found that the expansion was reasonable and consistent with the ADA's purpose. *Id.* at 1110–11. First, claimants may want to allow the EEOC's conciliation process to proceed past the 180-day mark in order to facilitate a settlement, and allowing them to do so without fear of losing their cause of action coheres with the ADA's remedial scheme. *Id.* at 1110. Second, equitable doctrines like laches can foreclose an action if the employer suffers prejudice because of the delay. *Id.* at 1111.

Reading *Steifel* and *Scott* together, Mills was entitled to file suit beginning 180 days after he filed his charge with the EEOC. *Stiefel*, 624 F.3d at 1245. His 90-day limit did not begin to run—and would not begin to run—until he received his notice of right-to-sue letter. Since he denied receiving the letter, Union Pacific was entitled to raise the mailbox presumption by introducing evidence that the right-to-sue letter was mailed on the date listed on the notice, but did not do so. Thus, under *Scott*, Mills was entitled to sue from the 180th day after filing his EEOC charge until it was no longer equitable of him to do so under the doctrine of laches. *Scott*, 888 F.3d at 1111.

Union Pacific does not frame its argument as arising under laches principles, but it does argue that it was prejudiced by Mills's thirteen-month delay in filing suit after asking for a right-to-sue letter. Dkt. 142-1, at 33. Even if Union Pacific did properly raise the laches issue, the Court would not apply it here. The *Scott* court acknowledged cases where a two-year gap between filing an EEOC charge and receiving a right-to-sue was excused (while noting that a 56 month gap had been found to implicate laches), casting doubt on whether Mills's delay was truly long enough for laches to apply.

Moreover, Union Pacific's claimed prejudice is nothing like the loss of evidence cited by the *Scott* court as possible grounds for invoking laches. *See Scott*, 888 F.3d at 1111. Union Pacific merely reiterates its position—already dismissed by the Court at summary judgment—that it was prejudiced by Mills's failure to tell a consistent story regarding whether he received the right-to-sue letter. Union Pacific argues that Mills's "evolving rationale" precluded Union Pacific from winning on its ADA failure to exhaust argument. Dkt. 142-1, at 32–33.

The Court should note that, to the extent Union Pacific argues Mills's story impermissibly shifted, the Court disagrees. Union Pacific attributes Mills's "shift" to his testimony at his deposition that he had no reason to believe he did not receive the notice of right-to-sue, which then changed to an outright denial of receiving the notice at summary judgment. The Court does not see any conflict here. A party with imperfect recollection of his own records may very well have no reason to believe he did not receive a certain letter, and upon further investigation, not locate that letter in his records. Nor does the Court believe the passage of time impacted Mills's recollection in a way which could implicate

laches. The delay of thirteen months was unlikely to seriously degrade Mills's memory, and Mills's testimony at his deposition was at best equivocal.

Laches looks to whether the passage of time itself caused a party to suffer prejudice (e.g. when evidence is lost over time, *see Scott*, 888 F.3d at 1111). Here, the Court finds insufficient evidence that Mills's story changed impermissibly due to a loss of memory to justify applying laches. It seems much more likely that, when he was deposed, Mills could not perfectly recall each of the various letters and notices he had received because of their numerosity rather than the passage of time, and that he was later able to consult his records to determine he had never received the letter. If Union Pacific did not believe Mills, it was entitled to introduce evidence of mailing to raise the mailbox rule presumption. That is precisely what the mailbox rule is for. But it did not do so.

Accordingly, the Court finds Mills's suit was timely filed and was not barred by either the 90-day ADA limitations period (because Union Pacific failed to raise the mailbox rule presumption at trial) or by Mills's claim that he never received his right-to-sue letter (because the letter itself is not necessary and laches is inapplicable). Union Pacific's Motion is, therefore, DENIED on this basis.

### C. Did Union Pacific Establish its Affirmative Defenses?

#### *1. Business Necessity*

Union Pacific argues the jury could not have reasonably rejected its business necessity defense. To prevail on a business necessity defense, the defendant must prove that the plaintiff was discriminated against based on a standard, criterion, or policy which was: 1) uniformly applied, 2) job-related, and 3) consistent with business necessity. Dkt.

116, at 29. Mills argues a reasonable jury could have found Union Pacific failed to carry its burden with respect to the last two elements—job relatedness and business necessity. Dkt. 145, at 16. The Court will take each in turn.

"To show 'job-relatedness,' an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Bates*, 511 F.3d at 996. As noted above, Mills was entitled to be certified if he could pass follow-on testing after failing the scientific screening tests. Since Union Pacific chose to use a Union-Pacific-developed field test (the Light Cannon) to perform follow-on testing, it could only use the Light Cannon if the Light Cannon itself satisfied the business necessity defense. So, if Union Pacific failed to show the Light Cannon fairly and accurately measured Mills's actual ability to discriminate between the colors of railroad signals, the jury's verdict must be affirmed.

The jury heard sufficient evidence to find against Union Pacific on job relatedness. Mills testified that he felt solar glare during his test. Trial Tr. Vol. II, at 317. Cunningham testified the Light Cannon did not look like a railroad signal. Trial Tr. Vol. III, at 463–64. Dr. Trangle, one of Mills's experts, testified the Light Cannon was not vetted against the real-life experience of an engineer in terms of signal duration, and that a report written by Drs. Rabin and Lovell indicated serious flaws in the Light Cannon's design. Trial Tr. Vol. III, at 409. The Rabin/Lovell report was received into evidence. Trial Tr. Vol. IV, at 625 (receiving Exhibit 1009). The jury heard evidence from Dr. Holland that initial testing (of which the railroad was aware) showed that roughly a quarter of people with accurate color vision failed the Light Cannon the first time they took it but all passed in the second

administration; the jury also heard that Dr. Holland denied Mills's request for a second administration of the Light Cannon. Trial Tr. Vol. IV, at 643–44. And the jury did not hear testimony from anyone present for Mills's test indicating the testing protocol was followed. *See* Trial Tr. Vol. IV, at 645.

A reasonable juror could have concluded from that evidence that Union Pacific failed to show, by a preponderance of the evidence, that the Light Cannon fairly and accurately measured Mills's ability to reliably distinguish between the colors of railroad signals. Union Pacific is not, therefore, entitled to judgment as a matter of law on its business necessity defense.[6]

*2. Direct Threat*

Lastly, Union Pacific argues no reasonable jury could have rejected its direct threat defense.

Employers do not violate the ADA when they terminate individuals who pose "a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). A direct threat is "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). The employer must prove the "significant risk" element by "medical or other objective evidence." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998). A medical professional's good faith belief that an

[6] Mills also argues that passing the Light Cannon was not consistent with business necessity because it was an optional test developed by Union Pacific. But the fact that Union Pacific developed the Light Cannon at its election is what subjects the Light Cannon to the business necessity framework, not a reason for it to fail that framework. *See* Section IV.A.1., *supra*. It was consistent with business necessity for a railroad to screen its employees for sufficient color vision acuity to read railroad signals in the interest of maintaining railroad safety. Whether the railroad's chosen test did so accurately is a question better considered under the job-relatedness prong. *See Bates*, 511 F.3d at 996.

employee posed a direct threat is insufficient to show significant risk, unless that belief is supported by objective, scientific information. *Id.* at 649–50. In determining whether the risk is significant, the jury is asked to consider "(1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999).

Here, Union Pacific points to three different pieces of allegedly valid, objective evidence: the fact Mills failed the Ishihara, the fact Mills failed the Light Cannon, and Dr. Holland's decision rejecting Mills's internal appeal of his FRA certification denial. Dkt. 142-1, at 42. But the Ishihara test determines whether a person has *any* degree of color vision abnormality, Trial Tr. Vol. II, at 173; Vol. III, at 409. Neither the FRA nor railroads treat failing the Ishihara as conclusive evidence that a person cannot correctly identify railroad signals in practice. *See* 49 C.F.R. part 242 app'x D(2), (4); Trial Tr. Vol. IV, at 678–79. The jury could have reasonably concluded Mills's Ishihara results did not indicate an imminent or likely risk of misidentifying a railroad signal. *See Nunes*, 164 F.3d at 1248. And, as the Court has already discussed, the jury could reasonably have concluded Union Pacific failed to meet its burden of showing Mills's Light Cannon results constituted valid, objective evidence. *See* Section IV.C.1, *supra*. A reasonable jury could have found the evidence that Mills failed the Ishihara and the Light Cannon insufficient to carry Union Pacific's burden on the "significant risk" element of its direct threat defense.

That leaves Dr. Holland's conclusion that Mills lacked sufficient color vision acuity to serve as a locomotive engineer. Ex. 2014. But Dr. Holland did not consider any

additional scientific or otherwise objective evidence in rejecting Mills's appeal of his FRA certification denial. Dr. Holland's determination relied on Mills's Ishihara results, Light Cannon results, and the fact that Mills did not offer any ophthalmological testing during his internal appeal. The fact that Dr. Holland is a medical doctor (Trial Tr. Vol. III, at 513) does not matter, either. In determining whether the employer based its direct threat determination on medical or other objective evidence, a physician "receives no special deference simply because he is a health care professional." *Bragdon*, 524 U.S. at 649. Dr. Holland's assessment thus does not provide any additional evidence that Mills posed a direct threat.

The jury could have reasonably found that Mills's Ishihara results did not indicate an imminent or likely threat; it could have reasonably found the Light Cannon did not constitute medical or other objective evidence, and it could have discounted Dr. Holland's assessment of Mills as simply reiterating Mills's Ishihara and Light Cannon results. Accordingly, the jury could have reasonably found Union Pacific failed to meet its burden with respect to its direct threat defense, either. Union Pacific's Motion is, therefore, DENIED.

## V. CONCLUSION

The Court commends the parties on their hard work in this difficult space. However, the Court stands by its rulings during trial, and finds that Union Pacific is not entitled to judgment as a matter of law. Because the Court rejects Union Pacific's legal arguments regarding the qualified individual element of Mills's case in chief and its time-bar

argument, and because substantial evidence supported the jury's rejection of its affirmative defenses, the Court DENIES Union Pacific's Motion.

## VI. ORDER

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant Union Pacific's Renewed Motion for Judgment as a Matter of Law (Dkt. 142) is DENIED.

DATED: August 17, 2026

David C. Nye
U.S. District Court Judge